1  STEVEN KALAR
   Federal Public Defender
2  SHAWN HALBERT, ESQ. - SBN 179023
   Assistant Federal Public Defender
3  19th Floor Federal Building – Box 36106
   450 Golden Gate Avenue
4  San Francisco, CA 94102
   Telephone:  (415) 436-7700

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                  FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11  UNITED STATES OF AMERICA,              )  No. CR-12-0119 SI
                                           )
12                      Plaintiff,         )  **DEFENDANT JOSEPH ORTIZ'S**
                                           )  **SENTENCING SUBMISSION AND**
13  v.                                     )  **OBJECTIONS TO FINAL PRESENTENCE**
                                           )  **INVESTIGATION REPORT**
14  JOSEPH ORTIZ, et. al.,                 )
                                           )  Court: Honorable Susan Illston
15                      Defendants.        )  Date: November 7, 2013 at 11:00 a.m.
                                           )
16                                         )
                                           )
17                                         )
    _____       )
18

19

20                          **INTRODUCTION**

21          Joseph Ortiz submits this memorandum in connection with his guilty pleas on July 18,

22  2013, by which he agreed to be sentenced to a term of five consecutive life sentences with a

23  mandatory consecutive 60-year term.  Because Joey Ortiz was facing the possibility of the death

24  penalty for more than a year, the defense spent much of that time conducting investigation and

25  interviews that revealed so many aspects of Mr. Ortiz's life, character and background that

26  undersigned counsel would have liked to have provided to the Court.  However, given the agreed-

1   upon sentence and the private nature of what was learned in the overall mitigation investigation,

2   undersigned counsel will not submit anything further in writing about Mr. Ortiz personally and

3   will briefly address the Court orally on Mr. Ortiz's behalf at sentencing.  Counsel is attaching

4   hereto as Exhibits A and B respectively materials that were provided to U.S. Probation and that

5   are referenced in the final PSR – a letter from Louis Pellagatti (Mr. Ortiz's mother's partner from

6   when Joey Ortiz was ages 4 through 11) and letters provided by Mrs. Theresa Johnson (Joey

7   Ortiz's fourth grade teacher).  The defense will submit under seal the report of Dr. Miora that is

8   also referenced in the PSR and that will be submitted to the Bureau of Prisons as part of the PSR.

9       The defense also submits this memorandum in order to ask the Court to modify certain

10  aspects of the final Presentence Investigation Report ("PSR") in this case.[1]

11      Finally, undersigned counsel requests that the Court ask the U.S. Marshal to facilitate Mr.

12  Ortiz being able to have physical contact with his mother, Tanya Rodriguez, in the courtroom

13  after the proceedings are completed, and if possible to allow them to speak for a few minutes.  Mr.

14  Ortiz also asks the Court to include in the Judgment and Conviction a recommendation to the

15  Bureau of Prisons that Ms. Rodriguez be permitted to visit her son in custody.

16

17

18

19

20

21      [1]The draft and final PSRs were completed after the deadlines set under the local rules.
The final PSR was produced on October 30, 2013.  Undersigned defense counsel attempted to
22  negotiate a continued sentencing date with the government, but government counsel were
unavailable after November 8, 2013 until November 25, 2013, at which point defense counsel
23  was no longer available.  In light of the foregoing, Mr. Ortiz submits this Memorandum only two
days before the sentencing date and hopes that this Court will have sufficient time to review the
24  objections.  Assuming the Court has sufficient time to review defendant's objections, Mr. Ortiz
has no objection to the timing of the final PSR.  However, the defense does object to the
25  government's overdue production of discovery to U.S. Probation after the issuance of the draft
PSR and asks that all material that appears for the first time in the final PSR be stricken, as
26  argued further herein.

# DISCUSSION

## A.    OBJECTIONS TO THE FINAL PSR

Joey Ortiz will spend the rest of his life in prison for the crimes he committed when he was twenty years old.  The PSR will be the document that the Bureau of Prisons uses for everything it does with regards to Mr. Ortiz, including not only designation to an institution but a myriad of other things that will affect his future safety and rehabilitation, such as his housing, educational, vocational and medical placements.  Thus, it is vital that the PSR be as accurate as possible and not contain damaging, inaccurate or unconfirmed information that could hinder Mr. Ortiz in the genuine efforts he wants to make to live as meaningful and productive a life as is possible under the circumstances.  Every sentence in the report is important because it can affect Mr. Ortiz's conditions of confinement for the rest of his life.

Mr. Ortiz has admitted to very serious conduct and has pled guilty to being involved in murdering three people and attempting to murder seven, so there is no shortage of information that will necessarily be in the PSR; however, there is other extraneous information in the final PSR that should be stricken from the report. The government had substantial power in the plea negotiations and required Mr. Ortiz to admit to a number of facts that he otherwise could have reasonably contested. This should be enough. The PSR should not contain unsubstantiated allegations, based on incomplete discovery provided by the government to U.S. Probation, that may be used to unfairly further restrict Mr. Ortiz's already substantially restricted future.

For that reason, undersigned counsel respectfully requests that the Court order the PSR to be amended after the Court's considerations of Mr. Ortiz's objections below.  While counsel from the Federal Public Defender's Office do not routinely ask for final PSRs to be amended, these requests have been made and granted in circumstances in which the PSR contains information that is inaccurate or insufficiently confirmed.

Mr. Ortiz sincerely appreciates U.S. Probation Officer Lilian's work on this case, as well

as the report that he produced. Given the length and breadth of the PSR, Mr. Ortiz actually has relatively few objections to the final PSR. As to those remaining objections, there was a greater level of detail included in the original objection than is recited in the Objections portion of the PSR, so Mr. Ortiz will provide the same, fuller objections herein. Some of the objections are those that were made to the draft PSR. *A further, separate category of objection* is to the inclusion of material in the final PSR that is unreliable and that was never included in the draft PSR. Regardless of how the Court rules on Mr. Ortiz's original objections, this new material should be struck because the process did not comply with the Criminal Local Rules, and so that Mr. Ortiz is not punished for raising objections to the report by having new negative material included – *i.e.* the worst he should end up is where he started before his objections.

### 1. **Objection Number 1 (¶¶ 50- 56):**

#### (a) **Original Objection**

As in his original objection to the draft PSR, Mr. Ortiz asks the Court to either delete these paragraphs regarding the history of Nuestra Familia (¶¶ 50- 56), or to order the inclusion of a clarification in bold at the beginning of ¶ 50 as follows: **"There is no allegation that Joseph Ortiz was ever a member of Nuestra Familia or that Nuestra Familia had any involvement in the crimes to which Mr. Ortiz pled guilty. The following is merely background information that would apply to any Norteño gang member."**

Mr. Ortiz was not born until 1990, and thus objects to the inclusion in the report of events relating to a gang of which he is **not** a member decades before he was born. The defense does not dispute that Mr. Ortiz is a Norteño. However, Nuestra Familia is a separate gang from the much tinier and less substantial gang of which Joey Ortiz was a member – the 500 Block/C Street gang. There is no evidence whatsoever – and the government has never provided any – to suggest that Nuestra Familia directed the activities of Mr. Ortiz or had any involvement in the crimes for which Mr. Ortiz pled guilty.

1    U.S. Probation's response to the objection is that "Norteño gang members claim their

2  allegiance and loyalty to Nuestra Familia..." (Prob. Resp. To Obj. 1).  This response proves too

3  much.  If it is the case that information about Nuestra Familia is included in the report because

4  Nuestra Familia controls all Norteño gangs, then this multi-paragraph preamble should be in all

5  PSRs of Norteños, which it is not – of the countless Norteño gang members whom undersigned

6  counsel has represented, there has never been a lengthy recitation about Nuestra Familia, which

7  would be appropriate only where the defendant was actually a member of Nuestra Familia.

8    There is no penological purpose to including this information, which suggests that Mr.

9  Ortiz is something other than the run-of-the-mill Norteño gang member.  If this information is

10  meant to be for the BOP's edification, it is unnecessary.  The BOP already knows that all Norteño

11  gangs claim allegiance to the Nuestra Familia prison gang – the BOP has far more expertise in the

12  dynamics of prison gangs than does U.S. Probation.  Given that this type of information is not

13  normally included in the PSRs of Norteños, a reader of the PSR at the BOP may reasonably

14  assume that if the material about Nuestra Familia is in the report, Mr. Ortiz must have a special or

15  personal relationship with Nuestra Familia or his crimes must have been connected to Nuestra

16  Familia, and neither of these things is true or has ever been suggested by the government.

17               **(b)      Further Objection Based on New Material in the Final PSR**

18    After receiving the defense's objections to the PSR, the government provided U.S.

19  Probation with additional discovery not provided in its original discovery to the government,

20  which was due on September 25, 2013 pursuant to Criminal Local Rule 32-3(c).  In its response to

21  Objection 1 in the final PSR, U.S. Probation cites (1) one of the newly-produced items, a "kite"

22  from Mr. Ortiz to another detainee, Fernando Rangel Jr., and (2) an excerpt of a summary of a

23  recorded call between Mr. Ortiz, his brother and their mother in which Mr. Ortiz stated that he

24  would persevere and elevate – as evidence that Mr. Ortiz has "deep involvement with the gang

25  and his ties to Nuestra Familia."  Probation Officer's Response to Objection Number 1, page 1.

26

In a separate paragraph, Paragraph 62, independent of responding to Mr. Ortiz's objections, U.S. Probation also included in the final PSR new references to the kite from Mr. Ortiz to Mr. Rangel, whereas there was no reference to this material in the draft PSR.

As an initial matter, it is unfair and punitive to include new, prejudicial information in the PSR in order to respond to an objection by the defense, particularly where the information (1) was not in the draft PSR and (2) is based on discovery provided to U.S. Probation long after the deadline for providing relevant information has passed.

More importantly, substantively neither the note to Mr. Rangel nor Mr. Ortiz's communication with his brother have anything to do with Nuestra Familia, although it is to respond to this allegation that the new material is allegedly being included in the report.

With respect to Mr. Rangel, the defense was unable to find a single reference to Mr. Rangel in its Case Map database, which contains all of the discovery provided by the government to the defense during the pendency of the case.

After the government's recent production of the Rangel communications to U.S. Probation and the inclusion of such material in the final PSR, defense counsel requested information from the government and U.S. Probation as to who Mr. Rangel even was.  The government provided a cryptic non-response and gave no explanation of who Mr. Rangel is and whether he is a member of Nuestra Familia – presumably he is not, or the government would have said that he is.  U.S. Probation Officer Trevor Lilian responded that he "immediately recognized Rangel's name as a known ranking NF within the federal system who was previously on supervised release with my office."  Mr. Lilian said that his knowledge was not based on communication with the government but "based my contacts with other law enforcement officers," whom Mr. Lilian did not identify.

Mr. Lilian's purported personal knowledge is not a reliable basis to include material in the report, particularly since defense counsel has no access to the information.  If Mr. Rangel is well-known to Mr. Lilian, it is based on information that is not available to the public and certainly not

to undersigned counsel.  Mr. Rangel's previous federal case was a standard felon-in-possession case in the Eastern District of California in which he was sentenced to 77 months (Case 05-cr-00480-WBS).  The documents in that case, including the sentencing memoranda of the parties, the detention order, the Judgment and Conviction, or the Form 12s in Sacramento or the Northern District of California do not contain any reference to Mr. Rangel being a Nuestra Familia gang member (or in fact a gang member at all, although Mr. Ortiz does not dispute that he is a Norteño).  In fact, a communication from the BOP to Judge Shubb regarding Mr. Rangel's designation describes him as a medium level designee, which would be surprising if he were an Nuestra Familia member.

Finally, Mr. Ortiz has further information regarding this objection that he will submit under seal and serve on the government

The second and final piece of information on which the PSR bases the sweeping statements about Mr. Ortiz are his statement to his brother a year and a half ago that he wanted to persevere and elevate.  U.S. Probation Officer indicated that he was relying on a report that contained a summary of all of Mr. Ortiz's calls from Glenn Dyer.  It appears that the government provided a summary of the call but not the recorded call to Mr. Lilian.

The telephone call has nothing to do with gangs, let alone Nuestra Familia. On February 14, 2012, the day after he was brought to federal court after having been in state custody on a probation violation for eight months, Mr. Ortiz called his mother and talked to his mother and brother at the same time on the phone.  Their conversation had nothing to do with gangs.  Rather, they were talking about why he was in federal custody (robbery charges), what kind of foods were available to him in the commissary (literally reading the 'menu'), and how federal custody might be different than local custody.  Mr. Ortiz's brother was telling him to stay strong in response to the federal charges, and Mr. Ortiz said he would persevere and elevate and would do things like sign up for a GED class.  The summary of the call provided to U.S. Probation was inaccurate at

best, and as the statement was taken completely out of context, it should be stricken from the report.

Finally, even if there were a reasonable argument that these two items had anything to do with Nuestra Familia, which there is not, neither item was in the draft PSR and so they were impermissibly included in the final PSR.  Relatedly, the new references to the note to Mr. Rangel are based on discovery that the government provided to U.S. Probation on October 23, 2013, long after the deadline of September 25, 2013 pursuant to Criminal Local Rule 32-3(c).  The worst that should happen to Mr. Ortiz upon making an objection is that the objection is overruled, not that new, prejudicial (and inaccurate) information be included in the PSR.

**2.      Objection Number 2** (¶ 60)**:**

        **(a)      Original Objection**

The defense requested that the statement in the first sentence of Paragraph 60, that Mr. Ortiz "was one of the ranking members on the 500 Block side of the 500 Block/C Street gang," be deleted.

        **(b)      Additional Objection to Newly Added Material (¶ 62)**

U.S. Probation's response to the objection is that the statement is correct because of a 2008 "kite" in 2008 from an unidentified person who described himself as the coach of the gang and Mr. Ortiz as the quarterback.

In a separate paragraph, independent of responding to Mr. Ortiz's objections, U.S. Probation also includes new references to the kite from this person to Mr. Ortiz in Paragraph 62, also provided to U.S. Probation by the government on October 23, 2013, after the deadline of September 25, 2013 pursuant to Criminal Local Rule 32-3(c); whereas there was no reference to this material in the draft PSR.  *See* Paragraph 62 (also stating that in 2008, Mr. Ortiz was given authority to make decisions and discipline younger "homies" once he was released from custody).  Thus, Mr. Ortiz's original objection now includes an objection to the information newly added in

the final PSR, specifically the second half of that paragraph regarding the kite.

The PSR does not contain any description of the identity or role in the 500 Block/C Street gang of the author of this kite.  The defense strongly disputes that Mr. Ortiz was one of the "ranking members" of 500 Block.  He absolutely was not.  He had no "rank." There was no one over whom he had any authority within the gang.  Because this allegation may have negative effects on Mr. Ortiz's BOP designation, housing and programming opportunities, it should be stricken.

U.S. Probation relies on only one piece of paper for this conclusion, the aforementioned note from an unidentified person, referred to as a "kite."  There are several reasons why the "kite" does not support the conclusions by U.S. Probation. First, the defense is not aware of any material provided in discovery that the author of the kite, whose identity and role in the gang is not referenced in the PSR, had any rank himself.  Second, the note does not say that Mr. Ortiz had decision-making authority – it says that the author of the kite told Mr. Ortiz that he (Mr. Ortiz) should recruit *high school members*, which Mr. Ortiz never did.  Over whom did Mr. Ortiz rank? Neither the government nor U.S. Probation has been able to identify an actual person who would say that Mr. Ortiz ranked over him – because there is no one.  It is a serious thing to tell the BOP that Mr. Ortiz was a "ranking" member of a gang. and because it is incorrect, it should be stricken.

Similarly, the references to the kite in Paragraph 62, and the corresponding allegations that Mr. Ortiz was a quarterback who had control over younger "homies" should be deleted.

**3.**    **Objection Number 3 (¶ 61):**

**(a)    Original Objection**

Mr. Ortiz requested that U.S. Probation add the following clarifying sentence at the end of Paragraph 61:  "There is no allegation that Mr. Ortiz personally or individually ever harmed or targeted any person for cooperating with law enforcement."  The government required Mr. Ortiz to include in his plea agreement that it was part of the conspiracy that the gang agreed that they

1  would kill people who cooperated with law enforcement, so the defense does not object to that

2  being in the PSR, but the defense requested the additional point of information that there was no

3  evidence that Mr. Ortiz ever personally harmed or attempted to harm an informant.

4       U.S. Probation's response is that when he was in custody, Mr. Ortiz speculated in a kite

5  that someone was snitching on him.  That is not the same thing as saying that he harmed or

6  targeted anyone to be killed.  It is basic investigative work in a case for defendants (and their

7  attorneys) to determine who is cooperating so as to assess the strength of the case against them.

8       The defense will further address this objection in the under seal portion of the filing.

9            **(b)     Additional Objection**

10      In a separate paragraph, independent of responding to Mr. Ortiz's objections, U.S.

11  Probation also includes new references to Mr. Ortiz's mention of "snitching," (¶ 62 of the final

12  PSR), whereas there was no reference to this material in the draft PSR and, as above, this was

13  based on untimely information provided to U.S. Probation by the government.  At most, the Court

14  should overrule defendant's objection and not add the clarifying language; additional information

15  need not be included.

16

17      **4.     Objection Number 4 (¶ 62):**

18          The defense requested that the sentence that Mr. Ortiz claimed gang membership in

19  2004 be stricken, as Mr. Ortiz was not a 500 Block gang member at that time – he was a 14 year

20  old boy who wanted to be.  He was not accepted into the gang until late 2005, as the government's

21  cooperators should be able to confirm.

22      Mr. Ortiz has previously objected to the second portion of this paragraph, everything after,

23  "The government has provided written materials..." for the reasons described above in other

24  objections, substantively as well as procedurally.

25      **5.     Objection Number 5 (¶ 65):**

26      The defense objects to the last sentence in Paragraph 65 and asks that it be stricken.  The

statement is false.  Mr. Ortiz has admitted to homicide on the night of December 22, 2010 and that is terrible enough – he has never shot a person who was not a gang member, so the allegation that he joked about shooting someone who was not a gang member is needlessly incendiary, particularly since it is incorrect.

U.S. Probation responded to the objection by saying that it shows Mr. Ortiz's "character." That makes it even worse, since U.S. Probation is intending the effect of this statement, which is to say something terrible about Mr. Ortiz's character when it is not true (and again, given what he has pled to, entirely unnecessary).

The witness upon whom Probation is relying has made innumerable false or inaccurate statements in this case.  She is not reliable and not available for the defense to cross-examine, and thus the defense requests that it be stricken.

**6.      Objection Number 6 (U.S. Probation lists Objection No. 5 twice - this is actually No. 6) (¶ 67):**

The defense requested that everything except the last sentence of this paragraph be stricken and replaced with the language to which the government and Mr. Ortiz stipulated in the plea agreement, ¶ 3(c)(iii), as follows:

> During the evening of on or about December 22, 2010, in South San Francisco, California, co-conspirators and Mr. Ortiz went looking for rival gang members whom Mr. Ortiz believed had threatened their gang territory and the 500 Block/C Street Gang racketeering enterprise for the purpose of defending the 500 Block/C Street Gang. As they drove down Eighth Lane, Mr. Ortiz observed a group of individuals Mr. Ortiz suspected were members of the rival gang. Some of Mr. Ortiz's co-conspirators and Mr. Ortiz got out of their car with guns and they fired at the group of suspected rival gang members in order to kill them. They then got back into their car and drove away. Mr. Ortiz stipulated that his co-conspirator(s) and he shot at seven individuals, that their shots hit six of the individuals, and that three of the individuals they hit were killed and the other three were wounded.

The defense submitted to U.S. Probation that if anything additional was necessary beyond what has been stipulated in the plea agreement, it would be appropriate to say only that the government has also charged Victor Flores, Justin Whipple and Benjamin Campos-Gonzalez with

the shootings.  However, the blow-by-blow description cannot be presented as fact when it has not been admitted, proven or even testified to.

The defense and the government negotiated painstakingly about the language in the plea agreement regarding the offense, and it is an end run around the plea agreement for the PSR to describe the events of December 22, 2010 in a way in which Mr. Ortiz refused to and could not have pled to and that have not yet been proven.

The defense finds U.S. Probation's insistence on stating as fact that the incident occurred as described by one cooperating witness in the case to be misguided.  That witness was not present at the scene and is demonstrably unreliable in many ways; at the very least, her account is contradicted by other accounts in the discovery by witnesses who were actually present during the shootings.  For example, as detailed in the government's discovery, the only person to be identified at the scene by the victim as one of the shooters was JustinWhipple, which directly contradicts the cooperator's statement.  Mr. Ortiz is not saying that either account is correct or incorrect, simply that there are very different accounts circulating.  The other three defendants are contesting the charges and the case is going to trial, so it is not correct to describe the offense in a way that one unreliable cooperating witness claims to have heard about it.  The defense also respectfully submits that it is not necessary to include other people's alleged specific actions in Joseph Ortiz's PSR, beyond what was stipulated to in the plea agreement.

**7.**    **Objection Number 7 (¶¶ 201, 212 - 216)**:

The defense objects to the inclusion of any juvenile arrests for which Mr. Ortiz was not convicted as they have no probative value.  In particular, ¶ 212 suggests something nefarious that never happened and was dismissed and yet could have the capacity to unfairly affect Mr. Ortiz.

**8.**    **Objection Number 8 (¶ 56)**:

Mr. Ortiz objected to the first sentence of Paragraph 56 in the draft PSR but the objection appears to have been overlooked.  The defense requests that the sentence be stricken because it is

incorrect as far as Mr. Ortiz has ever heard.  (Mr. Ortiz was always told that the police were responsible for coining the term "500 Block" and that the gang simply arose on its own, not in connection with any other gang.)  More significantly, government discovery GI 00001-00005 does not mention Cypress Park Locos as having anything to do with the formation of 500 Block or C Street and it says that C Street and 500 Block have been basically the same gang since 1995 (when Joey was 5 years old).  The government's report says that since 1993-1996, "there have been numerous documented instances of violence between these two gangs [Cypress Park Locos and C Street/500 Block]," a quotation that the defense had requested be included in the PSR to give the BOP context for the December 22, 2010 homicides.

**9.      Statement in Sentencing Recommendation re Tanya Rodriguez**

Finally, Mr. Ortiz asks the Court to strike the sentence in the Sentencing Recommendation that is critical of Tanya Rodriguez, saying "she exposed the defendant and his brother to an environment riddled with negativity, such as drug addiction, domestic disturbances and violence." This statement ignores the tremendous efforts that Ms. Rodriguez made and does not begin to reflect the complexity of her situation and parenting; further, it is unnecessary in light of the sentence to which the parties have agreed to in this case.  Mr. Ortiz is concerned that it could negatively affect whether the Bureau of Prisons, in its discretion, even decides to let Tanya Rodriguez visit Mr. Ortiz.

Mr. Ortiz has never said anything negative about his mother or her parenting and it was exactly a fear that his family members would be portrayed this way that was one of the reasons that Mr. Ortiz did not have a probation interview.  This Court will learn more about Ms. Rodriguez in connection with her sentencing, but the defense would like to address her background very briefly here in connection with U.S. Probation's comment, which the defense is not suggesting was ill-intentioned but is nonetheless inaccurate and condemning.

Ms. Rodriguez's parenting challenges were overwhelming and she did a remarkable job

given the parenting she had experienced as a child.  Ms. Rodriguez herself had a childhood filled with abandonment, violence and drug abuse.  At the age of 12, she came home to find her mother in the bathtub with her wrists slit, blood all over the floor and her little sister running around the house covered in blood.  Ms. Rodriguez went to live with her grandmother and did not see her mother again after that incident for several years, during which her mother was kidnapped by methamphetamine dealers and Tanya's family home was turned into a meth lab.  When Tanya's mother was returned to Tanya years later, her mother had partially lost her mind and bore signs of torture including having permanently had her fingernails removed.

Just a few years later, Tanya Rodriguez had two young children with Michael Ortiz Sr. – Michael Jr. and Joey, both of whom had Attention Deficit Disorder and related behavioral problems.  By the time she was a young woman, Ms. Rodriguez had survived the deaths of her brother, father and mother to drug/alcohol overdose (and possibly suicide).  Ms. Rodriguez worked full time and was responsible for all aspects of taking care of her children.  She endured domestic violence at the hands of all of her partners, but with each of them, she played a care-taking role by trying to help them to turn their lives around and to get sober, and left them whenever the violence escalated in order to shield her children.  Anything that the children experienced was collateral damage to what Ms. Rodriguez was experiencing.  With respect to Michael Ortiz Sr., who was very violent, Ms. Rodriguez left him as soon as she was able to set up full-time child-care, and after that, she had to endure stalking and violence, and had to enlist the police in keeping him away from her.  With respect to Louis Pellagatti (the father of Joey's younger half-sister Gabriella), and Mr. Trejo, Ms. Rodriguez's two subsequent partners, Ms. Rodriguez similarly would make them leave the home when things got worse, and they were both in and out of rehabilitation centers in order to try to get help.  As indicated in Mr. Pellagatti's letter, he did eventually get sober with Ms. Rodriguez's help once he moved away.

Part of the reason that Ms. Rodriguez stayed in these relationships was that she was always

trying to help people in trouble.  She was known for taking people into her home who needed a place to stay, including relatives and friends of Joey and Michael.  She worked in an inpatient and outpatient counseling center for women from 2000-2004, helping women with drug and alcohol abuse  and other issues.  Ms. Rodriguez was effectively the single parent of three children, while working full-time and enduring severe medical issues that led to almost constant pain and life-threatening surgeries.  She worked tirelessly to try to get the proper schooling, medical care and education for her sons, Joey in particular, though she ultimately was not able to do so for reasons beyond her control.

Ms. Rodriguez overcame substantial hurdles and parented Joey Ortiz with all of the love and care that she was capable of giving in very challenging circumstances.  Mr. Ortiz and his mother love each other deeply and it is not possible to convey in words the loss that they feel as a result of Mr. Ortiz's lifetime incarceration.  When the Bureau of Prisons makes a decision about whether Ms. Rodriguez can visit Mr. Ortiz in future years, it would be useful not to have a line in the PSR that suggests that Ms. Rodriguez deliberately exposed Mr. Ortiz to drugs and violence and therefore may not be an appropriate person to visit him.

**B.      THE DEFENSE REQUESTS THAT TANYA RODRIGUEZ AND JOSEPH ORTIZ BE PERMITTED TO HAVE ONE SHORT VISIT AFTER THE SENTENCING AND THAT THE COURT RECOMMEND TO THE BUREAU OF PRISONS THAT MS. RODRIGUEZ BE PERMITTED TO VISIT MR. ORTIZ DURING HIS INCARCERATION**

Because Ms. Rodriguez has pled guilty to a felony in the same criminal case as Mr. Ortiz, it will be at the discretion of the Bureau of Prisons to decide whether Ms. Rodriguez can ever visit Mr. Ortiz at a Bureau of Prisons institution.  In light of their very close bond and Mr. Ortiz's lifetime incarceration, the defense requests that after the sentencing hearing, when the courtroom has been cleared, the Court ask the U.S. Marshal to allow for Mr. Ortiz and Ms. Rodriguez to physically embrace and speak for a few minutes.  The defense also asks that the Court include in

the Judgment and Conviction a recommendation that Ms. Rodriguez be permitted to visit Mr. Ortiz while he is in BOP custody.

Mr. Ortiz asks the government to please not object to these requests in light of the sentence that is being imposed on Mr. Ortiz.

Dated: November 5, 2013

Respectfully submitted,
SHAWN HALBERT

By: /s/ Shawn Halbert
Attorney for Joseph Ortiz